**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | | |
|---|---|---|
| RHONDA M. VASSALLI, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:12 CV 1445 DDN |
| | ) | |
| CAROLYN W. COLVIN,[1] | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM**

This action is before the court for judicial review of the final decision of the defendant Commissioner of Social Security denying the application of plaintiff Rhonda M. Vassalli for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. § 401, et seq., and for supplemental security income under Title XVI of that Act, § 1381, et seq.  The parties have consented to the exercise of plenary authority by the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).  (Doc. 9.) For the reasons set forth below, the decision of the Administrative Law Judge is affirmed.

**I.  BACKGROUND**

Rhonda M. Vassalli ("Plaintiff"), born November 2, 1958, applied for Title II and Title XVI benefits on October 2, 2008.  (Tr. 140-51.)  She alleged an onset date of disability of March 15, 2004[2] due to Cushing's syndrome, cervical neck fusion,

---

[1] On February 14, 2013, Carolyn W. Colvin became the Acting Commissioner of Social Security.  The court hereby substitutes Carolyn W. Colvin as defendant in her official capacity.  Fed. R. Civ. P. 25(d).

[2] Plaintiff later amended her alleged onset date to February 22, 2008.  (Tr. 178.)

headaches, chronic fatigue syndrome, high blood pressure, heart problems, and depression. (Tr. 193-201.)  Plaintiff's applications for Title II and Title XVI benefits were denied initially on November 24, 2008 and October 9, 2008, respectively.  (Tr. 73-85.)  The denial of Title XVI benefits was based upon plaintiff's financial condition.  (Id.)  She appealed the denial of benefits under Title II and requested a hearing before an ALJ.  (Tr. 86-87.)

On September 8, 2010, following a hearing, the ALJ found plaintiff not disabled. (Tr. 10-19.)  On June 12, 2012, the Appeals Council denied plaintiff's request for review. (Tr. 1-6.)  Thus, the decision of the ALJ stands as the final decision of the Commissioner.

## II.  MEDICAL HISTORY

On March 18, 2004, plaintiff visited Michael Chabot, M.D., complaining of neck pain radiating into her shoulders for several months.  Plaintiff had a history of neck and shoulder pain stemming from her involvement in a motor vehicle accident.  Dr. Chabot indicated an impression of neck pain, cervicothoracic myofasciitis, disc degeneration, and suspected myelopathy.[3]  Dr. Chabot treated plaintiff with six trigger point injections to the thoracic spine and ordered an MRI.  Additionally, he instructed plaintiff to start outpatient physical therapy and prescribed Soma and Naprosyn.[4]  (Tr. 263-64.)

On March 26, 2004, plaintiff visited Dr. Chabot and discussed the results of the completed MRI.  The MRI revealed advanced disc bulging and degeneration at C5-C7

---

[3] Myofasciitis, or myositis fibrosa, is the hardening of a muscle through an interstitial growth of fibrous tissue.  Stedman's Medical Dictionary, 1272, 1275 (28th ed., Lippincott Williams & Wilkins 2006) ("Stedman"); Myelopathy is a disorder of the spinal cord.  Id. at 1270.

[4] Soma is a brand of carisoprodol, used short-term to treat muscle pain and discomfort. WebMD, http://www.webmd.com/drugs (last visited on June 6, 2013).  Naprosyn is a brand of naproxen, a non-steroidal anti-inflammatory drug used to relieve pain.  Id.

resulting in spinal stenosis.[5]  Dr. Chabot found that plaintiff suffered significant pathology resulting in neural compression, as well as evidence of myelopathy.   Dr. Chabot recommended surgery and instructed plaintiff to continue with her current medications. (Tr. 262.)

On April 13, 2004, Dr. Chabot performed surgery on plaintiff at C4-C6, including anterior cervical corpectomies, cervical fusion, and cervical plating, with no complications.  (Tr. 269.)

On April 26, 2004, plaintiff visited Dr. Chabot for evaluation post-surgery.  Dr. Chabot noted that plaintiff experienced expected stiffness and ache, and x-rays revealed satisfactory position of plate, screws, and implants.  He slightly adjusted the cervical collar to reduce flexion and recommended plaintiff to advance her home exercises.  (Tr. 261.)

On May 17, 2004, plaintiff visited Dr. Chabot for re-evaluation.  She was not wearing her collar, which led Dr. Chabot to question her treatment compliance, and had no complaints involving the upper extremities.  The x-rays again revealed satisfactory position of the plate, screws, and implants, and he instructed her to begin outpatient physical therapy.  He recommended that she continue her home exercises and noted that she could return to work when she felt physically fit to do so.  (Tr. 260.)

On June 22, 2004, Dr. Chabot noted that plaintiff's involvement in a motor vehicle accident near December 2, 2003 was a "significant contributing factor in exacerbating her underlying degenerative condition and spinal stenosis."  (Tr. 259.)

---

[5] The human spinal column consists of thirty-three vertebrae.  There are seven cervical vertebrae (denoted C1–C7), twelve thoracic vertebrae (denoted T1–T12), five lumbar vertebrae (denoted L1–L5), five sacral vertebrae (denoted S1–S5 and fused together into one bone, the sacrum), and four coccygeal vertebrae (fused together into one bone, the coccyx).  The cervical vertebrae form part of the neck, while the lumbar vertebrae form part of the low back.  The sacrum is immediately below the lumbar vertebrae.  Stedman at 2118-19.

On September 23, 2004, plaintiff visited Dr. Chabot, complaining of neck pain and stiffness involving the cervicothoracic junction. She also complained of discomfort involving the trapezius and scalenus musculature.  Upon noting an impression of cervicothoracic myofasciitis and back pain, Dr. Chabot recommended that plaintiff undergo trigger point injections.  He administered three injections to the main trigger point sites.  He prescribed Soma and Naprosyn and encouraged plaintiff to perform her home exercises.  (Tr. 258.)

On February 21, 2005, plaintiff again visited Dr. Chabot, complaining of bilateral shoulder pain.  She explained that pushing, pulling, and overhead activity tended to aggravate her symptoms significantly and that she had been using over-the-counter Aleve or ibuprofen to alleviate her pain.  Dr. Chabot noted an impression of shoulder bursitis/tendonitis, shoulder pain, and degenerative joint disease in the shoulder.  He administered an injection into each shoulder, prescribed Naprosyn and Vicodin,[6] and instructed her to begin outpatient physical therapy.  (Tr. 257.)

On May 12, 2005, plaintiff called Dr. Chabot regarding severe headaches in the base of her skull with vomiting and knotted neck muscles.  Dr. Chabot recommended Flexeril for tension.[7]  (Tr. 256.)

On September 22, 2005, plaintiff visited Anthony Keele, M.D., complaining of headaches and a lump on her right arm.  Dr. Keele diagnosed migraines and depression. He also increased plaintiff's prescription for Paxil to treat her depression.  (Tr. 300.)

On October 7, 2005, plaintiff visited Dr. Keele regarding pain and numbness in her upper left leg.  Dr. Keele removed a mole in her left leg.  Dr. Keele also noted her depression and weight gain.  (Tr. 299.)

---

[6] Vicodin is a brand of hydrocodone, an opioid used to treat moderate to severe pain. WebMD,    http://www.webmd.com/drugs    (last    visited    on    June    6,    2013).

[7] Flexeril is a brand of cyclobenzaprine, used short-term to treat muscle spasms.  WebMD, http://webmd.com/drugs (last visited on June 6, 2013).

On October 24, 2005, plaintiff saw Dr. Keele to remove stitches from her leg.  Dr. Keele assessed hyperlipidemia and hyperglycemia and instructed her to reduce her carbohydrate consumption.  (Tr. 298.)

On November 23, 2005, plaintiff visited Dr. Keele, complaining of neck and shoulder pain that resulted in headaches.  She also requested a neurology referral.  Dr. Keele prescribed Soma and recommended an MRI and physical therapy.  Also on November 23, 2005, plaintiff called Dr. Chabot regarding the same issue.  Dr. Chabot recommended Vicodin, muscle relaxers, and other medication, in addition to physical therapy.  (Tr. 256, 297.)

On January 4, 2006, plaintiff visited Dr. Keele, complaining of pain in her right arm and the feeling of something in her ear.  Dr. Keele noted chronic neck pain.  (Tr. 296.)

On March 3, 2006, plaintiff visited Dr. Keele regarding tingling of her feet and legs during the previous week.  Dr. Keele noted headaches and chronic fatigue.  (Tr. 294.)

On August 7, 2006, plaintiff complained of incontinence.  Dr. Keele noted plaintiff's depression.  (Tr. 293.)

On September 20, 2006, plaintiff visited Dr. Keele, complaining of leg swelling and pain during the previous two months.  Dr. Keele noted conditions including degenerative joint disease.  (Tr. 292.)

On January 19, 2007, plaintiff visited Dr. Keele, complaining of upper abdominal pain during the six months prior.  Dr. Keele prescribed refills of plaintiff's medications.  (Tr. 291.)

On July 16, 2007, Dr. Keele discontinued plaintiff's prescription for Paxil and prescribed Lexapro.[8]  (Tr. 290.)

On November 28, 2007, plaintiff visited Dr. Keele, complaining of headaches and feeling tired during the previous three days.  (Tr. 286.)

---

[8] Lexapro is a brand of escitalopram, an antidepressant used to treat depression and anxiety.  WebMD, http://www.webmd.com/drugs (last visited on June 6, 2013).

On December 28, 2007, plaintiff visited Dr. Keele regarding thyroid and other concerns.  (Tr. 285.)

On February 22, 2008, plaintiff visited Dr. Keele regarding pain in the neck causing pain to radiate to the head during the previous month.  Dr. Keele noted that plaintiff had a muscle spasm in her neck.  (Tr. 284.)

On March 17, 2008, plaintiff complained of headaches and bowel difficulty.  Dr. Keele prescribed Lexapro to treat plaintiff's depression.  (Tr. 283.)

On June 26, 2008, plaintiff complained of neck pains during the previous month. Dr. Keele prescribed refills on plaintiff's medications.  (Tr. 282.)

On July 11, 2008, plaintiff visited Dr. Keele regarding a rapid heartbeat, sweating, and hot flashes.  (Tr. 281.)

On July 23, 2008, plaintiff visited Dr. Keele concerning swelling in her neck and face during the previous two weeks, shortness of breath, sweating, and difficulty sleeping. Specifically, she stated that she slept only when taking Ambien.[9]  (Tr. 279.)

On August 29, 2008, Irini Veronikis, M.D., examined plaintiff regarding facial edema, heat intolerance, hypertension, weakness, weight gain, and irritability.   Dr. Veronikis diagnosed isolated secondary hypoadrenalism due to pituitary adrenal axis suppression, caused by previous steroid injections.  She noted that plaintiff received neck steroid injections two and six months earlier, which also caused water retention and facial edema.  Dr. Veronikis concluded that plaintiff would recover in the next few weeks and did not suggest any therapy.  (Tr. 302-06.)

On October 13, 2008, plaintiff visited Deanna Siemer, M.D., and notified Dr. Siemer that plaintiff had Cushing's syndrome and that she wanted to wean herself from

---

[9]   Ambien  is  a  brand  of  zolpidem,  used  to  treat  sleep  problems.    WebMD, http://www.webmd.com/drugs (last visited June 6, 2013).

Paxil.[10]  Dr. Siemer assessed Cushing's syndrome, hypertension, and high cholesterol. (Tr. 359.)

On November 10, 2008, plaintiff visited Dr. Siemer to follow up on her cholesterol and hypertension.  Dr. Siemer noted plaintiff's neck pain and ordered an MRI.  (Tr. 359.)

On November 18, 2008, Mel Moore, M.D., completed a Physical Residual Functional Capacity Assessment form and determined that plaintiff's allegations were partially credible.  Dr. Moore determined that plaintiff could lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand or walk about 6 hours during an 8-hour work day, and sit for about 6 hours during an 8-hour work day.  He also noted that plaintiff was limited from reaching in all directions.  He found that plaintiff had no postural, visual, or communicative limitations, but should avoid concentrated exposure to extreme cold, extreme heat, wetness, and humidity.   (Tr. 311-15.)

Also on November 18, 2008, Andrew E. West, M.D., after reviewing the MRI results, noted plaintiff had degenerative spondylosis with minimal central spinal canal stenosis and no cord deformity at C6-C7 and mild to moderate forminal stenosis at C4-C7. (Tr. 366-67.)

On November 21, 2008, Marsha Toll, Psy.D., completed a Psychiatric Review Technique form and found that plaintiff suffered depression.  However, she found plaintiff's mental health impairments not severe.  (Tr. 316-26.)

On December 30, 2008, plaintiff visited Annamaria Guidos, M.D., who evaluated plaintiff and diagnosed her with Cushing's syndrome, myofascial pain syndrome, numbness, paresthesia, headache, cervical stenosis, and hypertension.   Examination revealed limited range of motion in her neck and tenderness to palpation in her trapezius

---

[10] Cushing's syndrome is a hormonal problem caused by the presence of excess cortisol in the body.  It can cause many symptoms, including weight gain, weak muscles, and backaches.  WebMD, http://www.webmd.com/a-to-z-guides (last visited on June 11, 2013).

muscles.  Dr. Guidos instructed plaintiff to begin physical therapy for myofascial release and posture mechanics training.  (Tr. 327-32.)

On January 5, 2009, plaintiff began physical therapy for headaches and neck pain. Initial evaluation indicated a decrease in functional status.  Her therapy goals included increased range of cervical motion, decreased pain, and independence with her home exercise program.   Plaintiff missed several appointments and physical therapy was discontinued at her physician's request on February 12, 2009.  (Tr. 338-44.)

On January 23, 2009, Dr. Guidos performed neurodiagnostic tests on plaintiff in response to complaints of paresthesia in her feet and left leg when she sat for prolonged periods of time.  She found the results unremarkable.  (Tr. 333-35.)

On February 5, 2009, an ultrasound examination of plaintiff's lower extremities was conducted and the results did not suggest significant peripheral vascular disease.  (Tr. 354.)

On February 24, 2009, plaintiff visited Dr. Siemer, who again noted plaintiff's hypertension and high cholesterol.  Additionally, plaintiff complained of night sweats and requested Premarin.[11]   Dr. Siemer prescribed Premarin to treat her night sweats and recommended she continue her current medications.  (Tr. 359.)

Plaintiff's insured status under Title II of the Act expired on March 31, 2009.

On April 28, 2009, Dr. Siemer witnessed plaintiff's fatigue.  She also noted a history of hypothyroidism and Cushing's disease.  On June 1, 2009, plaintiff visited Dr. Siemer, complaining of depression and the effectiveness of Lexapro.  Dr. Siemer noted plaintiff's depression and prescribed her Premarin and Pristiq.[12]  (Tr. 358.)

---

[11] Premarin is an estrogen, a female hormone used to reduce symptoms of menopause. WebMD, http://www.webmd.com/drugs (last visited June 6, 2013).

[12] Pristiq is a brand of desvenlafaxine, used to treat depression.   WebMD, http://www.webmd.com/drugs (last visited June 6, 2013).

On June 18, 2009, plaintiff visited Dr. Chabot, complaining of neck pain, spasm, burning, and ache.  She told him that her symptoms were aggravated by nearly all activities.  Further, she explained that she underwent treatment with Dr. Keele and she developed Cushing's syndrome as a result of the trigger point injections.  Dr. Chabot noted tension and trigger points throughout the neck with limitation on her range of motion by nearly 20%.  He noted an impression of neck pain, cervicothoracic myofasciitis, and disc degeneration.  He recommended that plaintiff be evaluated by a rheumatologist and prescribed Soma to reduce muscle spasm.  He instructed plaintiff to continue with home exercises.  (Tr. 273-75.)

On July 6, 2009, plaintiff again visited Dr. Siemer with complaints of fatigue.  Dr. Siemer's assessment noted hypothyroidism and questionable fibromyalgia.  She prescribed plaintiff Cymbalta.[13]  (Tr. 358.)

On July 14, 2009, plaintiff was examined by Sandra S. Hoffmann, M.D., concerning pain in plaintiff's neck and shoulders, numbness and tingling in her arms and feet, and joint pain and swelling in the knees.  Dr. Hoffmann noted that the rheumatology evaluation gave her an impression of myofascial syndrome with shoulder pain and prescribed Cymbalta, Ambien CR, Klonopin, and Mobic.[14]  X-rays of plaintiff's pelvis indicated significant arthritis of both hips with sclerotic changes of the acetabulum, moderate cystic change, mild joint space narrowing, and mild sacroiliitis.  (Tr. 373-80.)

On October 30, 2009, Dr. Hoffmann explained that plaintiff was currently unable to work due to a combination of severe pain, a need to use Vicodin on a regular basis, and a high level of fatigue due to her conditions.  Dr. Hoffmann noted plaintiff's history of neck

---

[13] Cymbalta is a brand of duloxetine, used to treat depression and anxiety.  WebMD, http://www.webmd.com/drugs (last visited June 6, 2013).

[14] Klonopin is a brand of clonazepam, used to prevent and control seizures and treat panic attacks.  WebMD, http://www.webmd.com/drugs (last visited June 6, 2013).  Mobic is a brand of meloxicam, used to treat arthritis by reducing pain, swelling, and stiffness of the joints.  Id.

and shoulder pain and current condition, including surgical procedures and medications. She concluded that plaintiff could not maintain 8 hours of work on a 5-day schedule to maintain full-time employment.  She opined that "sedation due to chronic use of narcotics interferes with cognitive function" and that plaintiff should be considered disabled both physically and cognitively.  (Tr. 381.)

On December 15, 2009, Jennifer Benoist, ANP, examined plaintiff regarding unexplained weight loss and depression.  Ms. Benoist directed plaintiff to stop taking thyroid medication because she suspected it might have been causing the weight loss.  She noted that plaintiff discontinued Hyzaar, which she took for hypertension, due to lightheadedness.  She assessed hyperthyroidism, insomnia, fibromyalgia, hyperlipidemia, tobacco use, depression, anxiety, Cushing's syndrome, and peptic ulcer disease.  Additionally, Ms. Benoist increased plaintiff's dosage for Ambien to help with insomnia and increased dosage of Cymbalta to treat fibromyalgia and depression.  Ms. Benoist noted that plaintiff's Cushing's syndrome, caused by excessive corticosteroid, was resolved.  She also recommended that plaintiff restart Crestor to treat hyperlipidemia.  (Tr. 402-03.)

On January 14, 2010, plaintiff visited Dr. Hoffmann and Ms. Benoist, complaining of stomach pain located in the epigastric region.  A prior upper endoscopy indicated that plaintiff had a small gastric ulcer.  On January 15, 2010, Sanjay T. Bhat, M.D., noted gastric abnormality in plaintiff's abdomen and pelvis scan.  He performed an upper gastrointestinal endoscopy, which revealed a giant gastric ulcer.  (Tr. 386-87, 390-91, 396, 400, 415.)

On January 20, 2010, Dr. Hoffmann noted plaintiff's complaints of pain and requests for stronger narcotic pain medication.  Plaintiff reported taking her husband's Vicodin pills, which were more potent than her prescription.  Dr. Hoffmann conveyed reluctance to prescribe a higher dose due to the level of pain that normally accompanied her conditions and concern for plaintiff's inconsistency in taking her medication.  Dr.

Hoffman also recognized that plaintiff had fatigue and a very poor sleep cycle that consisted of staying awake on her computer at night and sleeping during the day.  Dr. Hoffmann recommended that she improve her sleep habits, proceed with pain management, and follow up with Dr. Bhat.  (Tr. 398.)

On February 8, 2010, plaintiff had a follow-up meeting with Dr. Bhat regarding her gastric ulcer.  He noted an impression of a giant gastric ulcer and recommended she increase her dose of Prevacid.[15]  (Tr. 423.)

On February 10, 2010, plaintiff went to the emergency room and complained of epigastric pain.  Dr. Hoffmann diagnosed giant gastric ulcer, dyslipidemia, gastroesophageal reflux disease, fibromyalgia, and insomnia.  She discontinued plaintiff's use of non-steroidal anti-inflammatory drugs.  (Tr. 384.)

On April 8, 2010, Dr. Bhat performed another upper gastrointestinal endoscopy on plaintiff.  Dr. Bhat noted his impression that plaintiff's gastric ulcer was healing and recommended that plaintiff continue using Prevacid.  (Tr. 411-14.)

On May 20, 2010, Dr. Bhat performed another gastrointestinal endoscopy and noted that plaintiff's gastric ulcer was continuing to heal.  (Tr. 408-10.)

On June 14, 2010, plaintiff again visited Dr. Bhat, who noted that plaintiff had a persistent gastric ulcer.  He noted that her ulcer biopsies were inconclusive.  He gave plaintiff the option to see Dr. Strasberg to evaluate for surgical treatment.  (Tr. 422.)

On June 21, 2010, plaintiff met with Steven M. Strasberg, M.D., regarding surgical intervention for her gastric ulcer.  Dr. Strasberg ordered a CT scan to be performed in order to determine the degree of perigastric inflammation.  He recommended waiting a month or two to see if her ulcer will heal because she had recently stopped smoking cigarettes.  (Tr. 425-26.)

On June 22, 2010, a CT scan of plaintiff's abdomen was conducted.  From the results, Dr. Strasberg found no evidence of a gastric ulcer.  (Tr. 430-31.)

---

[15] Prevacid is a brand of lansoprazole, used to decrease the amount of acid produced in the stomach. Id.

- 11 -

**Testimony at the Hearing**

The ALJ conducted a hearing on August 2, 2010.  (Tr. 25-70.)  Plaintiff testified to the following.  Plaintiff lives in a single-story house with her retired husband.  She is fifty-one years old and measures five foot, three inches and 130 pounds.  She drives about twenty miles per week and has a valid driver's license.  Plaintiff is unemployed and has no income outside of her husband's retirement income.  She has health insurance through her husband.  She has a twelfth grade education and received some vocational training for dog grooming.  (Tr. 30-34.)

From 1995 to 2001, plaintiff worked at Petsmart as a dog groomer, occasionally lifting large dogs with assistance.  She then stocked shelves at Garden Ridge for 8 months, in a role that did not require lifting items over 10 pounds.  She was unable to return to that position after her surgery.  She attempted to work at Walmart, but only stocked shelves for a couple of days.  Plaintiff worked in 2006 as a cable splicer for nearly 18 weeks and was not required to lift anything over 10 pounds.  She began work at Sears in the lawn and garden department, but quit working after orientation.  She acquired a job in a boarding house as a housekeeper, but quit after one week.   In 2008, plaintiff left her last job working in the kitchen at a nursing home after three days because she could not stand for the necessary amount of time.  She groomed dogs intermittently for 20 years.  Since leaving her job at the nursing home, she has not sought employment due to her physical condition, including Cushing's disease and fibromyalgia.  (Tr. 34-40, 63-64.)

Periodic injections in her neck induced Cushing's disease.  Her adrenal glands shut down and her body swelled, leaving her unable to do anything.  She no longer has Cushing's disease because she changed doctors and was diagnosed with fibromyalgia.  The fibromyalgia causes pain across her shoulders, down her back, in her neck, and down to her elbows.  The pain can result in migraine headaches and cause her to become very ill.  She also experiences pain in the back of her legs in the hamstring area and by her lower hip.  To alleviate pain, plaintiff lays on the side of the bed with pillows down her

back and one in front about four times per day in one hour intervals between 9:00 a.m. and 5:00 p.m.  (Tr. 40, 50-51, 59-63.)

On a typical day, plaintiff gets up after noon.  In the morning, she sits on the couch or outside and takes her medication and does little other than reading or playing with her computer, although she occasionally wipes counters.   When reading, she can only concentrate for 30 minutes at a time without taking a break or falling asleep.   In the afternoons she also watches television and naps.  She does not cook, launder, change bed sheets, or vacuum.  Plaintiff shops for groceries and put groceries away in the trunk, but at times gets assistance with things she cannot carry.  She used to visit friends more than she currently does.  She socializes mainly through her computer.  (Tr. 40-43, 59.)

Plaintiff gets along with her husband and children.  She does not participate in any clubs or organizations.  She does not have any hobbies or participate in any activities other than going out to eat often and sitting outside with her four year-old grandson.  Plaintiff cannot lift her grandson.  She does not have problems taking a shower but she holds onto bars on the sides of the shower. (Tr. 43-44.)

Plaintiff does not smoke or drink and takes only medication prescribed by her doctor.  She takes Novigil for fatigue.  She takes Predavil to treat her high blood pressure that she has had for four years.  She takes Prevacid to treat her large ulcer, which has decreased the size of it.  She takes Synthroid for her overactive thyroid.  She continues to take two Ambien every night to help her sleep, which works occasionally.  Plaintiff takes Klonopin, a muscle relaxer, to help her sleep at night and treat her fibromyalgia.  She still takes Cymbalta as well to treat her fibromyalgia and depression.  She also takes Vicodin when she goes to bed and when she gets up in the morning.  She takes Crestor for her high cholesterol.  Additionally, she takes Lexapro for depression, Xanax for depression and anxiety, and Neurontin for nerve pain.  Besides sedation, she experiences no known side effects from her medications.  (Tr. 45-50, 60.)

- 13 -

Plaintiff had a surgical fusion but still experiences neck pain.  On a scale of one to ten, plaintiff's pain is typically at a five across her neck and shoulders.  The pain can reach ten quickly.  The pain in her shoulders and neck cause her to get migraine headaches, which can cause her to vomit.  She has medicine for migraines, but only takes it when she has a severe headache.  (Tr. 51-52.)

She also gets headaches as a result of sitting or standing for long periods of time.  She cannot walk well and typically walks only to her mailbox across the street and back to her house.  She can lift about ten pounds but does not lift much besides her small dog.  She has difficulty with maintaining certain postures and cannot stoop down easily.  She tends to avoid using steps and can only walk up ten at most.  (Tr. 56-57.)

Plaintiff has shortness of breath.  She has not had a heart attack or stroke.  She has had chronic fatigue syndrome for a few years and feels tired all of the time.  Novagel helps with her fatigue but she is only able to take one a day and she is tired by noon.  She also has had hip pain recently.  (Tr. 53-54.)

Plaintiff has been depressed for a long time.  She has been taking Lexapro for about two months, Cymbalta for a year, and Xanax for two months.  She feels depressed for no apparent reason and cries sometimes.  She takes Xanax to treat her nervousness.  She has had a couple panic attacks, the latest taking place in a store a couple of years ago.  She has not been to a mental hospital and does not seek psychiatric care.  She has mood swings very often and cannot concentrate.  (Tr. 54-56.)

During the hearing, plaintiff experienced a headache as a result of sitting for ten minutes.  She typically has pain after ten minutes of sitting or standing.  (Tr. 58.)

Vocational Expert (VE) Mr. Stocki also testified at the hearing. He stated that plaintiff's past work included working as a pet groomer and stock clerk.

The ALJ presented a hypothetical individual with plaintiff's age, education, and past relevant work experience.  The hypothetical individual was capable of performing light work, except that such individual could not climb ladders, ropes, or scaffolds, could

- 14 -

reach overhead, balance, stoop, crouch, kneel, and crawl only occasionally, and should avoid concentrated exposure to humidity, wetness, and extreme temperatures.

The VE testified that such individual could not perform plaintiff's past work. When asked whether there were any other jobs that an individual with the plaintiff's restrictions could perform, the VE responded that said individual could perform work as a housekeeper, which is light work with 400,000 positions nationally and 10,000 positions in Missouri.  Additionally, such individual could perform work as a packer/mailer, which is light work with 320,000 positions nationally and 8,000 positions in Missouri.  The VE clarified that these positions are only representative rather than exhaustive.  (Tr. 65-68.)

Plaintiff's counsel also presented a hypothetical individual with an inability to sit or stand longer than 10 to 15 minutes at a time, the inability to lift more than 10 pounds, and a need to recline or lay down four times a day for an hour each time.  The VE responded that the individual could not perform substantial gainful activity.  (Tr. 68-69.)

## III. DECISION OF THE ALJ

On September 8, 2010, the ALJ issued a decision that plaintiff was not disabled under Title II of the Social Security Act.  (Tr. 10-19.)  At Step One of the prescribed regulatory decision-making scheme,[16] the ALJ found that plaintiff had not engaged in substantial gainful activity between the amended alleged onset date, February 22, 2008, and the date she was last insured under Title II, March 31, 2009.  At Step Two, the ALJ found that plaintiff's severe impairments through the date she was last insured were degenerative disc disease of the cervical spine with status post remote fusion, cervical myofasciitis, hypertension, hypothyroidism, gastric ulcer, and a history of Cushing's syndrome.  (Tr. 12.)

At Step Three, the ALJ found that plaintiff, through the date she was last insured, had no impairment or combination of impairments that met or was the medical equivalent

---

[16] See below for explanation.

- 15 -

of an impairment on the Commissioner's list of presumptively disabling impairments. (Tr. 15.)

The ALJ considered the record and found that plaintiff, through the date she was last insured, had the residual functional capacity (RFC) to perform light work, except for lifting or carrying more than 20 pounds occasionally and 10 pounds frequently, standing or walking more than 6 hours in an 8-hour workday with normal work breaks, climbing ladders, ropes, or scaffolds, climbing ramps or stairs, balancing, stooping, kneeling, crouching, crawling, or reaching more than occasionally, and concentrated exposure to extreme heat, cold, wetness, or humidity.  At Step Four, the ALJ found that plaintiff, through the date she was last insured, was unable to perform any past relevant work.

At Step Five, the ALJ found that considering plaintiff's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that plaintiff could have performed through the date she was last insured.  (Tr. 12-15.)

## IV.  GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and are supported by substantial evidence in the record as a whole.  Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009).  "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion."  Id.  In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision.  Id.  As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently.  See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove he is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months.  42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A); Pate-Fires, 564 F.3d at 942.  A five-step regulatory framework is used to determine whether an individual is disabled.  20 C.F.R. § 404.1520(a)(4); see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Pate-Fires, 564 F.3d at 942 (same).

Steps One through Three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her disability meets or equals a listed impairment.  20 C.F.R. § 404.1520(a)(4)(i)-(iii).   If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five.   Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform her past relevant work (PRW).  Id. § 404.1520(a)(4)(iv).   The claimant bears the burden of demonstrating she is no longer able to return to her PRW.  Pate-Fires, 564 F.3d at 942.  If the Commissioner determines the claimant cannot return to PRW, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work that exists in significant numbers in the national economy.   Id.; 20 C.F.R. § 404.1520(a)(4)(v).

## V.  DISCUSSION

The plaintiff argues that (1) the ALJ erred in assessing plaintiffs credibility by failing to make specific findings regarding plaintiff's testimony, (2) the ALJ erred by failing to give sufficient weight to the opinion of Dr. Hoffmann, and (3)  the ALJ erred in determining RFC by failing to properly analyze plaintiff's impairments and limitations.

- 17 -

### A. Plaintiff's Credibility

Plaintiff argues that the ALJ erred by failing to make sufficiently specific findings regarding plaintiff's testimony and credibility, and failed to follow the applicable case precedent.  Specifically, plaintiff argues that the ALJ's summary credibility discussion is insufficient and that the ALJ failed to cite to medical evidence contradicting plaintiff's statements or offer explanations of why plaintiff's statements were not credible.

To assess a claimant's credibility, the ALJ must look at (1) the claimant's daily activities; (2) the duration, frequency, and intensity of pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effect of medication; (5) functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints.   Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008); Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).  The ALJ does not need to recite and discuss each of the Polaski factors when making a credibility determination.  Casey v. Astrue, 503 F.3d 687, 695 (8th Cir. 2007).  If the ALJ rejects the subjective complaints of the plaintiff, the ALJ must "make an express credibility determination explaining the reasons for discrediting the complaints." Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000).

The ALJ discussed that plaintiff did not experience significant limitations regarding her daily living activities.  The ALJ recognized that plaintiff's prior work history detracts from her credibility because she never worked on more than a sporadic basis and never demonstrated a motivation to work.  (Tr. 16, 33-40.)  The ALJ noted that plaintiff's daily activities are inconsistent with allegations of disabling symptoms and limitations because she is able to live and function independently, engaging in many activities such as driving and shopping.  (Tr. 16, 40-45.)  Additionally, the ALJ witnessed no obvious credible physical or mental discomfort during the course of the hearing, and no third party lay testimony was provided to support plaintiff's allegation of disability.  (Tr. 17.)

The ALJ also opined that plaintiff's history of medical treatment undermines her claim of disability. "If an impairment can be controlled by treatment or medication, it cannot be considered disabling." Roth v. Shalala, 45 F.3d 279, 282 (8th Cir. 1995). He noted that she received minimal treatment during the period of alleged disability and that there is a lack of evidence to show ineffective medications or a need for assistive devices. (Tr. 16.)  He also noted seemingly successful treatment of her conditions.  (Tr. 16, 260, 302-03, 402-03.)  The ALJ observed that plaintiff's restriction of daily activities appear to be by choice, rather than any apparent medical prescription.  (Tr. 16.)

The ALJ also discussed the discrepancies between plaintiff's subjective mental complaints and the objective medical information.  An ALJ is entitled to determine that a claimant's testimony about her subjective complaints is not credible when objective evidence contradicts the testimony.  Baker v. Barnhart, 457 F.3d 882, 892-93 (8th Cir. 2006).  Though plaintiff argues that the ALJ failed to make sufficiently specific findings regarding plaintiff's credibility in regards to her alleged depression, the record indicates otherwise.  The ALJ specifically addressed plaintiff's alleged depression and pointed to objective evidence in assessing her credibility.  (Tr. 14.)  By looking to the lack of necessity for psychiatric intervention at an emergency room or inpatient psychiatric hospitalization, unremarkable mental examinations indicating no significant impairment, and a psychological opinion indicating no severe impairment, the ALJ properly found plaintiff's testimony regarding her depression not credible when concluding that plaintiff's depression was not a severe mental impairment.  (Tr. 14, 283, 293, 299-300, 316-26, 358, 402-03.)

The ALJ did not explicitly explain every Polaski factor but considered the relevant information in assessing plaintiff's credibility.  In sum, substantial evidence supports the ALJ's credibility analysis.

**B.  Opinion of Dr. Hoffmann**

Plaintiff argues that the ALJ did not properly afford Dr. Hoffmann's opinion sufficient weight.

"[A] treating physician is normally entitled to great weight." <u>Prosch v. Apfel</u>, 201 F.3d 1010, 1013 (8th Cir. 2000).  However, an ALJ may "discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." <u>Id.</u>  Further, "[i]t is permissible for an ALJ to discount an opinion of a treating physician that is inconsistent with the physician's clinical treatment notes." <u>Davidson v. Astrue</u>, 578 F.3d 838, 843 (8th Cir. 2009); <u>Raney v. Barnhart</u>, 396 F.3d 1007, 1010 (8th Cir. 2005).

Defendant argues that the two visits plaintiff made to Dr. Hoffmann were legally insufficient to establish a relationship sufficient to make Dr. Hoffmann plaintiff's treating physician.  (Doc. 2 at 14.)  Although Dr. Hoffmann may be a treating physician of the plaintiff, the ALJ found that Dr. Hoffmann's opinion regarding plaintiff's ability to work was inconsistent with her physical examination on July 14, 2009 and plaintiff's other objective medical evidence of record.  (Tr. 17.)  Dr. Hoffmann opined that plaintiff was physically and cognitively disabled.  (Tr. 381.)  However, her treatment notes indicate that plaintiff had little physical impairment outside of arthritis of both hips, which did not result in functional limitations.  (Tr. 374-80.)  Dr. Hoffmann also noted during both examinations prior to her opinion that plaintiff was alert and oriented, in contradiction to her assertion that plaintiff was cognitively disabled.  (Tr. 374, 386.)  Her indication that plaintiff's medications interfere with her cognitive function is not supported by evidence. (Tr. 381.)  Dr. Hoffmann later noted plaintiff's sleep habits as a likely cause of her fatigue and that no obvious diagnosis accounted for plaintiff's asserted level of pain.  (Tr. 398.) Substantial evidence supports the ALJ's decision to give Dr. Hoffmann's opinion less than great weight.

**C.  RFC Assessment**

Plaintiff argues that the ALJ erred in the RFC determination because it was not supported by substantial evidence.   Specifically, plaintiff argues that the RFC determination does not account for several relevant medical treatment records and limitations arising from plaintiff's impairments.

RFC is the most a claimant can perform despite her physical or mental limitations. 20 C.F.R. § 404.1545(a).  RFC is a medical question, and the ALJ's determination of RFC must be supported by substantial evidence in the record.  Hutsell v. Massanari, 259 F.3d 707, 711 (8th Cir. 2001); Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001); Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 2000).  In determining a claimant's RFC, the ALJ should consider all relevant evidence, including objective medical records, observations of treating physicians, and an individual's subjective description of her limitations.  Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009); 20 C.F.R. § 404.1545(a).  As a medical question, an ALJ's RFC assessment must be supported by some medical evidence of the claimant's ability to function in the workplace.  Moore, 572 F.3d at 523.

Plaintiff argues that the ALJ incorrectly concluded that she retained the RFC to perform light work with limitations.  Pointing to records of examinations, plaintiff argues that there are significant limitations and conditions in the record that were not adequately accounted for in the ALJ's determination.   These include pain, headaches, fatigue, medication side effects, and muscle spasms.  However, the ALJ specifically addresses much of the record relating to plaintiff's condition.  The ALJ acknowledged plaintiff's tenderness in her neck and upper back, and a limited range of motion.  (Tr. 16.)  Further, the ALJ made findings that plaintiff had the severe impairments of degenerative disc disease, cervical myofascitis, hypertension, hypothyroidism, gastric ulcer, and a history of Cushing's syndrome.  (Tr. 12.)  The ALJ determined that each of these conditions had either been resolved or treated effectively and that plaintiff's remaining impairments are minor and do not result in long-term functional limitations or complications.  (Tr. 16-17.)

- 21 -

Although the ALJ failed to address evidence in the record indicating plaintiff's muscle spasms or medication side effects, his determination was supported by substantial evidence.  There is no indication that muscle spasms or side effects rendered plaintiff disabled or were significant factors contributing to disability.  Additionally, the opinion of Dr. Hoffmann indicating that plaintiff suffers side effects can be entitled to little weight, as discussed above.  The ALJ supported his determination of plaintiff's RFC by noting that her daily activities and medical history do not support her claims of disability and render her testimony not credible, as discussed above.  (Id.)  The ALJ buttressed his conclusion by accepting the opinions of Dr. Moore, who determined that plaintiff is limited to light work activity.  (Tr. 17, 311-15.)

Plaintiff also argues that the ALJ erred in not affording appropriate weight to her mental impairments, which include depression, anxiety, limited concentration, and crying spell interruptions.  Although plaintiff asserts that there is evidence of severe mental impairments in the records of Dr. Keele, substantial evidence supports the ALJ's determination that these impairments did not result in cognitive limitations contributing to disability.  In addition to noting an unremarkable psychiatric review by Ms. Toll, the ALJ recognized plaintiff's treatment for depression with medication and determined that the limitations with concentration and interruptions do not have a disabling effect on plaintiff. (Tr. 14, 300, 316-26.)

Plaintiff's assertion that the ALJ did not rely on substantial evidence in reaching the RFC is without merit.  The ALJ's determination of plaintiff's RFC is supported by substantial evidence in the record.

## VI.  CONCLUSION

For the reasons set forth above, the decision of the Commissioner of Social Security is affirmed.  An appropriate Judgment Order is issued herewith.

_____/S/__David D. Noce_____
**UNITED STATES MAGISTRATE JUDGE**

Signed on July 23, 2013.